Opinion
DOZIER, Acting P. J.
This case involves the ubiquitous problem of how damages should be computed for breaches of the implied warranty of habitability, an issue not yet decided by the appellate courts in California.
Facts
In this unlawful detainer action, the tenant appeals from a judgment of the Stockton Municipal Court in which it was adjudged that the landlord recover the sum of $533.37 back rent plus costs of suit, plus supplemental costs if incurred in effecting eviction, with a stay of execution to December 21, 1979. The judgment was entered on December 26, 1979, so there was, in effect, no stay of execution at all. The tenant, however, left the premises on December 31st.
The tenant, in appealing the judgment, is not seeking a total reversal but simply modification of the judgment by reducing the rental damages from $533.37 to $167.07.
The engrossed settled statement discloses that the court had made a finding of breach of implied warranty of habitability, the factual basis for which is set forth therein. However, the engrossed settled statement does not disclose the problem raised on this appeal. It is necessary to *Supp. 26 look to Judge Fransen’s memorandum decision of December 4, 1979, and his order for entry of judgment of December 26, 1979, in order to find out what actually happened. In his memorandum decision, Judge Fransen first found that the market rental value as impliedly warranted of the rental unit occupied by the defendant was $175. He then found a breach of the implied warranty of habitability which resulted in a 33 1/3 percent reduction in the habitability of the premises, which he held reduced the market rental value (“as is”) to $116.67 (two-thirds of $175) per month from January 1979 to the date of trial, November 27, 1979. He then found that the tenant had paid $750 towards the rent during this period, and deducted that sum from the figure of $1,283.37, representing the reasonable value of the premises at the rate of $116.67 per month from January through November 1979. He thus arrived at the judgment figure of $533.37.
What the defendant tenant is objecting to is the use of the market rental figure of $175 per month as the basis for applying the 33 1/3 percent reduction in rent, since $175 per month was not the agreed rental. The engrossed settled statement discloses that the agreed rental at the time in question was $125 per month.
There was no expert testimony as to market rental value either as warranted or “as is.” The tenant, during her testimony at the trial, made the statement that she had looked for other housing but landlords would not take children and she found the rents were outrageous, but that similar places to hers rented for $175 per month. It was this figure that Judge Fransen therefore adopted as representing the market rental value of the premises during the period in question if it had been in a condition as warranted.
As can be seen, this appeal is not concerned at all with the sufficiency of the evidence to support the finding of breach of implied warranty of habitability, as such evidence is outlined in the engrossed settled statement, Rather, the sole question is whether it was error for Judge Fransen to apply the percentage reduction in use of 33 1/3 percent to the market rental value of the premises (as warranted) rather than the agreed rent. If the agreed rental of $125 per month had been used, the rental still owing to the landlord by the tenant would be as the tenant contends on this appeal, only $167.07 ($125 times two-thirds, times months of occupancy, minus $750 paid) instead of the judgment figure of $533.37. The defendant simply seeks a modification of the judgment in this respect. She does not contest the award of costs to the *Supp. 27 landlord despite the fact that she was the prevailing party on the affirmative defense of breach of implied warranty of habitability.
The seminal case in California is, of course, Green v. Superior Court (1974) 10 Cal.3d 616 [111 Cal.Rptr. 704, 517 P.2d 1168].
Here the California Supreme Court decided that to protect poor tenants from exploitation by powerful landlords there should be implied in residental tenancies an implied warranty of habitability, i.e., that the premises were reasonably habitable by average tenants. Through this doctrine aggrieved tenants could protect themselves by withholding a portion of the rent until the premises were made habitable, rather than being left to their impractical remedy of suing the landlord for repair. (Recent cases (1971) 84 Harv. L.Rev. 729 at p. 734.)
There have been only two Court of Appeal cases since Green and many issues are left unresolved. For example, does the implied warranty of habitability apply to protect a tenant who takes occupancy in spite of the patent defects observed by him? Knight v. Hallsthammar *(Cal.App.) says No! but this conclusion is questionable in view of the fact that the implied warranty is mandatory and designed to force landlords to fix up dilapidated dwellings whether or not the defects are obvious (See 84 Harv. L.Rev. at pp. 736-737 and Teller v. McCoy (1978) — W.Va. — [253 S.E.2d 114] holding that for reasons of public policy the implied warranty of habitability cannot be waived by the tenant', see also, Foisy v. Wyman (1973) 83 Wn.2d 22 [515 P.2d 160, at pp. 167-168] holding that the warrant cannot be abrogated by tenant landlord agreement.)
It does appear from Civil Code sections 1941 and 1942 that the tenant in California at the initiation of the tenancy can expressly agree to waive specific defects in habitability. Presumably then he cannot later base a claim of a breach of the implied warranty of habitability on such defects. However, note that the Civil Code sections apply only to the tenant’s right to repair and charge the lessor.
A second question of importance is whether there is any difference in application of the doctrine to future rent abatement as distinguished from past tenant damages.
*Supp. 28 Our present case, however, is clean in the sense that it presents no other problem than the precise one of how the tenant’s damages should be computed when he is no longer an occupant. Here the facts are that the tenant occupied premises not obviously defective and occupied them for several years while the rent slowly rose and the condition of the premises steadily deteriorate.
In the United States cases and law reviews, there have been five different methods suggested for computing the tenant’s damages for breach of the implied warranty of habitability.
The first two are the alternatives suggested in Green, to wit:
I. Take testimony and find the market rental value monthly of the premises as impliedly warranted and then the market rental value monthly of the premises “as is”, i.e., in their eventually known defective condition. The difference between the two multiplied by the months of occupancy is the figure for the tenant’s damages.
This method has one theoretical defect and one practical defect. The first is that it is questionable whether there is a “market” rental value of premises patently defective. Is there a “market” rental value for premises known to be substantially in violation of housing codes and thus illegal? (Abbott, Housing Policy, Housing Codes and Tenant Remedies: An Integration (1976) 56 B.U.L.Rev., at p. 23 points out the many hazards to expert testimony in this area.)
“In Steinberg v. Carreras, 74 Misc. 2d 32, 38, 344 N.Y.S.2d 136, 144 (N.Y. City Civ. Ct. 1973) the trial judge noted: T seriously doubt that statistical information about the value of apartments operated in violation of law is available in a form that permits meaningful expert testimony.’” (Moskovitz, The Implied Warranty of Habitability: A New Doctrine Raising New Issues (1974) 62 Cal.L.Rev. 1444, fn. 105, hereafter, Moskovitz.)
The second flaw in this measure is that market rental value can properly be testified to only by experts who qualify by experience and the performance of market studies. In the usual small case like the present no one can afford to hire the experts.
*Supp. 29 Despite these defects, this method of computing damages was suggested as a possibility in Green, supra, and has been utilized in other states (See cases cited in 56 B.U. L.Rev., at p. 21, fn. 126.)
The method used by Judge Fransen to find market rental value as impliedly warranted ($175) based on the tenant’s opinion that similar places which accept children rent for $175 was obviously inadequate as the tenant was in no sense a qualified expert. Admittedly, appellate courts in other states have ignored this obvious deficiency because of the expense of securing experts. (See Teller v. McCoy, supra, 253 S.E.2d 114.)
II. The second method suggested by Green is to first recognize the agreed contract rent as something the two parties have agreed to as proper for the premises as impliedly warranted. Then the court should take testimony and find on the percentage reduction of habitability (or usability) by the tenant by reason of the subsequently ascertained defects. Then reduce the agreed rent by this percentage, multiply the difference by the number of months of occupancy and voila!—the tenant’s damages.
This method has the defect of the inherent uncertainty in measuring a percentage of loss of habitability. What percentage should be attributed to loss of aesthetic values (such as cracked and water-stained walls and ceilings) as distinguished from insufficient heat or water? (See, however, Knight v. Hallsthammar, supra, (Cal.App.), which held that the implied warranty of habitability guarantees only “necessary living requirements” and not amenities or pleasing aesthetics.) How should one measure intermittent defects as compared to continuous ones?
These are obvious problems, but courts and writers have offered plausibly helpful suggestions as to how this measurement should be performed. (See McKenna v. Begin (1977) 5 Mass.App. 304) [362 N.E.2d 548], Cooks v. Fowler (D.C.Cir. 1971) 459 F.2d 1269 and Moskovitz, supra, 62 Cal. L.Rev. 1444, at p. 1469.)
Furthermore, if there is no better way to measure damages, uncertainty in the best method chosen has never been held to be fatal. (McKenna, supra, 362 N.E.2d 548; Pugh v. Holmes (1979) — Pa. — 405 A.2d 897; Stoiber v. Honeychuck (1980) 101 Cal.App.3d 903 [162 *Supp. 30 Cal.Rptr. 194] also holds that the courts in measuring damages for breach of the implied warranty must just “do the best they can.”)
Moskovitz (62 Cal. L.Rev. 1444) in discussing these two methods points out (1) that in the first method the agreed rent is immaterial (except possibly as some evidence of market rental value as warranted) and (2) that in the first method the percentage reduction in habitability is immaterial, as the “as is” market rental value need not even roughly coincide with a percentage reduction in habitability, and (3) that in the second method the market rental value (as warranted or “as is”) is immaterial.
Judge Fransen fell between two stools as it were. He used market rental value as warranted (first method) and then reduced it by percentage loss of habitability (second method) in arriving at the “as is” market rental value.
For this reason, as well as the insufficiency of the evidence to support any finding as to market rental value as warranted, the lower court’s judgment will have to be modified.
III. The third method is that utilized by the Appellate Department of the Superior Court of Los Angeles County in Quevedo v. Braga (1977) 72 Cal.App.3d Supp. 1 [140 Cal.Rptr. 143] and by several cases in the eastern states (see cases cited at p. 21 of 56 B.U. L.Rev.).
The suggested method in these cases is to take evidence and find the market monthly rental value in the “as is” (knowingly defective) condition, subtract this from the agreed contract rent and the difference multiplied by the months of the occupancy is the damage figure.
Quevedo v. Braga, supra, cites no appellate authority, and little wonder, as the suggested method is dead wrong. It suffers first from the flaw of requiring testimony as to market value of patently defective and possibly illegal premises. And secondly, and more importantly, it is a method of damage computation taken unthinkingly from personal property breach of implied warranty cases and ignores the public policy behind the adoption of the doctrine of implied warranty of habitability of residences.
That purpose is to force the rehabilitation of substantially defective slum dwellings so that the poor may live decently. This third *Supp. 31 suggested method would only further this policy if the landlord was a “rent gouger.” If he charged low rents because of the poor quality of his premises, the agreed rent and the market rent for the “as is” premises would differ little, if at all. A tenant living in a pigsty would recover nothing because he was paying pigsty rents. This is probably good contract law, but it is poor implied warranty of habitability law. (See 56 B.U. L.Rev., at p. 22.)
The Quevedo method of computing damages was rejected in Pugh v. Holmes, supra, 405 A.2d 897, because (a) it did not further the policy of the creation of the implied warranty of habitability, and (b) delapidated illegal (violation of housing code) dwellings should not be given a market rental value.
IV. The fourth method is that suggested by Moskovitz, supra, namely: “Forget about market rent and agreed rent and just give the tenant a recovery for his “discomfort and annoyance.”
This method is unappealing for two reasons: First, it permits recovery for nonmalicious mental distress unaccompanied by physical injury, a situation that until recently has been avoided by the courts. (Gruenberg v. Aetna Ins. Co., (1973) 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032]; Shepard v. Superior Court (1977) 76 Cal.App.3d 16 [142 Cal.Rptr. 612]; Arauz v. Gerhardt (1977) 68 Cal.App.3d 937 [137 Cal.Rptr. 619]; Fuentes v. Perez (1977) 66 Cal.App.3d 163 [136 Cal.Rptr. 275].
Secondly, it opens the door for selected juries in urban areas to nail landlords for intangible (and inherently immeasureable) injuries even though a cause of action for intentional infliction of emotional distress will not lie.
A measure of damages which bears no relation to the value of the lease contract to either party (note: McKenna v. Begin (1975) 3 Mass. App. 168 [325 N.E.2d 587] which held that in no event could the contract damages for breach of the implied warranty of habitability exceed the contract rent), and which is so open-ended, will either drive landlords out of business (and thus dry up rental housing) or drive their insurance rates sky high (to be taken out of the hides of tenants).
Note, also that Quevedo v. Bragg, supra, dismissed the cause of action for “discomfort and annoyance” by the tenant.
*Supp. 32 Unless directed by an appellate court, this court will not approve a measure of damages with such potential dire results in order to permit a jury of insomniacs to give a sleepless tenant massive damages by reason of a dripping bathroom faucet.
It should be acknowledged that the Moskovitz suggestion was adopted in Teller v. McCoy, supra, 253 S.E.2d 114. However, in Stoiber v. Honeychuck, supra, 101 Cal.App.3d 903 the Court of Appeal held that while the contract cause of action for breach of the implied warranty of habitability does not permit recovery for “discomfort and annoyance” the plaintiff tenant may plead a cause of action in tort (negligence) for the breach of the implied warranty of habitability.
If he does, the court implies he may collect damages for “discomfort.” Note, however, that Stoiber does not discuss the propriety of collecting damages for mental distress in a negligence action where no physical injury exists.
In any event, the tenant in the present case did not plead tort cause of action, possibly because a counterclaim cannot be filed in an unlawful detainer action (see Moskovitz, supra, 123 p. 1472).
V. The fifth method of computation of damages is that suggested by the Restatement Second of Property, section 11.1, to wit: The ratio of the ‘as is’ market value and the warranted market value multiplied by the contract rent, subtracted from the contract rent and then multiplied by the months of occupancy.
This has two defects; first, it is mind boggling. (If we assume, however, that the “as is” market value is $100 monthly and the warranted value is $150 and the contract rent is $110, the equation is
100 - x 110 = X 150
and $110 minus X times the number of months of occupancy.)
Second, it has the disadvantage explained above of requiring expert testimony as to market values as warranted and market values “as is” illegally. Such testimony may not be available.
*Supp. 33 Ratiocination on these five methods indicate that they are all lamentable, but that method II is the least of the evils, and the one selected by this court as (1) most likely to achieve the goals desired by the Supreme Court in creating the implied warranty of habitability (residential), as (2) least likely to cause the shift of landlords’ capital to the Zurich gold market, and (3) as manageable by trial courts.
This method of damage computation is recommended in 84 Harv. L.Rev., at p. 737; McKenna, supra, 362 N.E.2d 548; Pugh v. Holmes, supra, 405 A.2d 897; Morbeth Realty Corp. v. Rosenshine (1971) [67 Misc.2d 623 [323 N.Y.S.2d 363]; Academy Spires, Inc. v. Brown (1970) 111 N.J. Super. 477 [268 A.2d 556]; Glyco v. Schultz (1972) 32 Ohio App.2d 281, 61 Ohio Op.2d 346; [289 N.E.2d 919]; and Morbeth Realty Corp. v. Velez (1973) 73 Misc.2d 996 [343 N.Y.S.2d 406].
The agreed rent is something the parties have fixed, so traditional contract law instructs us to give it substantial weight. Percentage of reduction of habitability is uncharted but is no more difficult than valuing loss of consortium or emotional distress, which courts do every day just as if they know what they are doing. The trial court can consider the area affected, the amount of time the occupant is exposed to it, the degree of discomfort the defect imposes, the quality of the defect as health threatening or just intermittently annoying, the extent to which such a defect causes tenants to find the premises uninhabitable and leave, et cetera and make a considered estimate as to the percentage reduction of habitability.
The method does have a substantial possibility of injustice to the landlord in one situation, to wit: where he has by reason of premise defects set a low rent (by negotiation with a knowledgeable tenant or not) for the premises and later is faced with a bludgeon of even lower rents through a claim of a breach of the implied warranty of habitability. Thus, there is justice in forcing a landlord to disgorge $50 per month for premises that rented for $150 but were only worth $90 to $110. There is, however, a visceral queasiness in nailing a landlord who has rented the place for $90 because of the defects (perhaps after a discussion of the defects with the tenant), being forced to reimburse the tenant $30 a month because a court finds that the premises are 30 percent less habitable than a similar place in good condition. This, however, would be a result of the mandatory nature of the implied warranty of habitability and the policy of forcing the rehabilitation of markedly substandard dwellings. (See 84 Harv.L.Rev. 729, and Foisy *Supp. 34 v. Smith, supra, where even though the tenant and landlord had negotiated a low rent because of obvious defects, the tenant was still able to get even a lower rent in an action for breach of the implied warranty of inhabitability.) In any event, it is not a situation we face in the present case.
There is no need to send the case back to the trial court because we have the figures we need, to wit: the contract rent of $125 per month and the trial court’s finding of a 33 1/3 percent reduction in habitability and the months of occupancy.
The judgment is modified to grant a recovery to the landlord of $167.07 instead of $533.37, and the trial court is ordered to enter the judgment as directed.
Kim, J., concurred.

Reporter’s Note: Hearing granted March 24, 1980. See 29 Cal.3d 46 [171 Cal.Rptr. 707, 623 P.2d 268] for Supreme Court opinion.